## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                             :

MICHELE SCHROLLER, et al.,        :       CIVIL ACTION
                             :
             Plaintiffs,      :
                             :
          v.              :       No.  11-7719
                             :
UNITED STATES OF AMERICA,     :
                             :
             Defendant.     :
_____:

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                             **JULY 26, 2013**

      Presently before this Court is Defendant, United States of America's, Motion to Dismiss, and Plaintiffs, Michele and William Schroller's, Response in Opposition.  For the reasons set forth below, Defendant's Motion is granted.

## I.    BACKGROUND

### The Parties

      Plaintiffs, Michele and William Schroller ("Plaintiffs"), are married adult individuals who reside in Pennsylvania.  (Compl. ¶ 1.)  Defendant, United States of America (the "Government"), is the owner of Valley Forge National Park ("VFNP").  (Id. ¶ 3.)  VFNP was established to "preserve and commemorate . . . the area associated with the heroic suffering, hardship, and determination and resolve of General George Washington's Continental Army during the winter of 1777-78."  See 16 U.S.C. § 410aa.  The National Park Service ("Park Service"), which is a bureau of the Government within the United States Department of the Interior, operates and maintains VFNP.  (Compl. ¶ 2; see also 16 U.S.C. § 1.)

**The Incident**

VFNP is located northwest of Philadelphia and encompasses over 3,500 acres of land and features over thirty miles of trails.  (Dep. of John Waterman at 12.)  There are "thousands, if not millions" of trees dotting VFNP.  (Id. at 8.)  Plaintiff Michele Schroller ("Schroller") often walked these trails to enjoy the scenery of VFNP.  (Dep. of Michele Schroller at 14-15, 23.)

Plaintiffs allege that at approximately 10:15 a.m. on October 7, 2009, Schroller was walking on the main paved pathway by the Welcome Center of VFNP, when suddenly and without warning, a tree limb fell onto her, hitting her on the head and other parts of the body.  (Compl. ¶ 9.)  The limb fell from a tree located adjacent to the pathway.  (Id.)

Plaintiffs further claim that the falling limb forced Schroller to the ground and caused serious injuries.  (Id.)  These injuries included: a closed head injury with post-concussion syndrome, a fractured skull, a scalp laceration resulting in scarring and disfigurement, fractured teeth, an acute tear of the right rotator cuff, post traumatic vertigo and other injuries, which have yet to be determined.  (Id. ¶ 14.)

**Procedural History**

On December 19, 2011, Plaintiffs filed suit against the Government pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.,* for damages suffered from the falling tree limb.  (See Compl.)  This suit included a loss of consortium claim by Plaintiff William Schroller.  (Id.)  In total, Plaintiffs seek damages in excess of $150,000.  (Id.)  On May 15, 2013, the Government filed a "Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment" to which Plaintiffs promptly responded.  (See Docs. 18, 19.)

## II.    STANDARD OF LAW

The United States enjoys immunity deriving from its status as a sovereign nation.  United States v. Mitchell, 445 U.S. 535, 538 (1980) (citing United States v. Sherwood, 312 U.S. 584, 586 (1941)).  This immunity shields the United States from liability unless it consents to be sued.  Id.  The Federal Tort Claims Act ("FTCA") is one such instance where the United States has waived its sovereign immunity for:

> claims . . . for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

However, the FTCA explicitly excepts from tort liability, "[A]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  This exclusion, known as the Discretionary Function Exception ("DFE"), "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 819-20 (1984).  The purpose of the exception is "to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort."  Id. at 814.

Plaintiffs bear the burden of showing that their claims are cognizable under the FTCA.

Merando v. United States., 517 F.3d 160, 165 (3d Cir. 2008) (citing In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 361 (3d Cir. 2001)).  Conversely, if the government is claiming the conduct is shielded from liability under the DFE, the onus is on the government to prove its applicability.  Id. (citing Cestonaro v. United States, 211 F.3d 749, 756 n. 5 (3d Cir. 2000)).

The analytical framework utilized by courts in making the DFE determination is as follows.  Initially, the government conduct at issue must be identified.  Merando, 517 F.3d at 165.  Next, a two-part inquiry set forth by the Supreme Court in United States v. Gaubert, 499 U.S. 315 (1991), determines the applicability of the DFE to a particular case.

In the first part of the Gaubert inquiry, the court must decide whether the conduct giving rise to the alleged injury and the subsequent litigation involves an "element of judgment or choice."  Id. at 322-23 (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)).  "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'"  Id. (quoting Berkovitz, 486 U.S. 536).  Thus, the language of the regulation is of critical importance.  "If a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation."  Id.  However, "[I]f the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."  Id.  Conversely, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."  Id.

The second <u>Gaubert</u> inquiry asks, where the challenged conduct involves an element of judgment, "whether that judgment is of the kind that the discretionary function exception was designed to shield." <u>Merando</u>, 517 F.3d at 165 (quoting <u>Gaubert</u>, 499 U.S. at 324).

> Because the purpose of the exception is to prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.

<u>Gaubert</u>, 499 U.S. at 324. More concisely stated, the Government's conduct must be "grounded in the policy of the regulatory regime." <u>Id.</u> at 324-25. "Notably, 'if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the litigation.'" <u>Baer v. United States</u>, No. 12-1319, 2013 WL 3481485, at *7 (3d Cir. July 1, 2013) (quoting <u>Gaubert</u>, 499 U.S. at 324). Finally, in order for Plaintiffs to survive the Government's Motion to Dismiss, they must have alleged facts that would "support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." <u>Gaubert</u>, 499 U.S. at 324-25.

## III. DISCUSSION

The Government argues that dismissal is mandated because the federal courts lack subject matter jurisdiction over this litigation due to the DFE, and/or in the alternative, that the Pennsylvania Recreational Use Act, 68 Pa. Cons. Stat. § 477-6, warrants summary judgment in the Government's favor. (Def.'s Mot. to Dismiss at 7.) We find the former issue to be

determinative in this case and, therefore, proceed to analyze the applicability of the DFE. In deciding this issue, we are guided by the United States Court of Appeals for the Third Circuit's ("Third Circuit") decision in <u>Merando</u>. <u>See</u> <u>Merando</u>, 517 F.3d at 168.

The facts and legal issues in <u>Merando</u> mirror our case, and are as follows. The tragic events underlying <u>Merando</u> occurred in the Delaware Water Gap National Recreation Area ("DWG"), a federal government park occupying 63,000 acres in New Jersey and Pennsylvania, which is managed by the Park Service. <u>Merando</u>, 517 F.3d at 163. While driving through the DWG, a tall red oak tree located about six yards off the road fell onto a car killing two of the passengers. <u>Id.</u> The father and husband of the deceased passengers filed suit in federal court under the FTCA alleging that the tree constituted a "hazardous and extremely dangerous condition," which the government knew or should have known to exist and removed. <u>Id.</u> The government moved to dismiss the litigation arguing that the federal courts lacked subject matter jurisdiction over the matter on the basis of the DFE. <u>Id.</u> In support of its motion, the government asserted that its conduct was discretionary because the Park Service operated under an informal plan for identifying and removing trees, which took into account the finite resources available to it. <u>Id.</u> at 174. The District Court granted dismissal concluding that the DFE "immunized the Government from a lawsuit based on its decisions regarding the maintenance of the Park and the carrying out of that maintenance by the Roads and Trails crew," and the Third Circuit affirmed. <u>Merando v. United States</u>, No. 04-3288, 2006 WL 2865486 (D. N.J. Oct. 5, 2006), *aff'd*, 517 F.3d 160 (3d Cir. 2008).

Viewing the facts of this case through the lens of <u>Merando</u>, we find that the Government was performing a discretionary function. Consequently, the Government's conduct at issue is

immunized from tort liability. Our reasoning is based on the following analysis.

## The Discretionary Function Analysis

Prior to undertaking the two-part inquiry set forth in <u>Gaubert</u>, we must first identify the conduct at issue. <u>Gaubert</u>, 499 U.S. at 322-23. In this case, the Park Service's plan to inspect and maintain the trees within VFNP and its execution of that plan constitute the conduct at issue in relation to the DFE. <u>See</u> <u>Merando</u>, 517 F.3d at 168. Thus, "the relevant inquiry is whether the controlling statutes, regulations, and administrative policies mandate that the Park Service locate and manage hazardous trees in any specific manner." <u>Id.</u>; <u>see also</u> <u>Autery v. United States</u>, 992 F.2d 1523, 1528 (11th Cir. 1993). "If not, the Park Service's decisions as to the precise manner in which to do so, and its execution of those decisions, clearly fall within the discretionary function exception to the government's tort liability." <u>Id.</u> (citing <u>Varig Airlines</u>, 467 U.S. at 819-20); <u>see also</u> <u>Autery</u>, 992 F.2d at 1528.

## The Two-Part Gaubert Test

The first prong of the <u>Gaubert</u> test asks whether a statute, regulation or policy requires the Park Service to locate and manage hazardous trees in any specific manner, or whether the government's actions were discretionary because they involved "an element of judgment or choice." <u>Merando</u>, 517 F.3d at 168 (quoting <u>Gaubert</u>, 499 U.S. at 322). The Government contends that the Park Service's decision to follow an informal procedure of tree maintenance and inspection required the necessary element of judgment or choice. (Defs.' Mot. to Dismiss at 12.) In support of this contention, the Government cites to the Third Circuit's decision in <u>Merando</u> as "directly on point." (<u>Id.</u>) After consideration of the record and the applicable judicial precedent, we agree with both assertions.

7

After examining the statutory purpose of the Park Service, the Park Service's mission at the park and the 2001 Management Policies and the 1991 Natural Resource Management Guidelines produced by the Park Service, the <u>Merando</u> Court found an absence of any language directing how the Government should locate or deal with hazardous trees.  <u>Merando</u>, 517 F.3d at 170, 172.  Rather, the Third Circuit concluded that these documents exhibit that the Park Service operated under an informal plan, whereby the "Park Service was responsible for choosing the methods by which it maintained the park and protected its visitors."  <u>Id.</u> at 172.

In this case, a review of the relevant statutes and regulatory guidelines evidences a lack of any language mandating specific conduct on the part of the Government.  The statute establishing the Park Service defines the Service's fundamental purposes as "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same."  <u>See</u> 16 U.S.C. § 1.  This statutory framework empowers the Secretary of the Interior with the "discretion" to  "provide . . . for the destruction of such animals and of such plant life as may be detrimental to the use of any of said parks."  <u>Id</u>.  The Park Service's 2006 Management Policies state that "[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing."  (<u>See</u> Def.'s Mot. to Dismiss, Ex. D.)  This language explicitly grants discretion to the Park Service employees in dealing with dangerous conditions in VFNP, and leads us toward the conclusion that the Government's conduct was within the scope of the DFE.  <u>See</u> <u>Merando</u>, 517 F.3d at 172.

The depositions of Park Service employees signify that, though there was no formal written policy for dealing with hazardous trees in VFNP, there was an unwritten plan in place at

the time of the incident.  (See Dep. of John Waterman at 17-18, 21-22; Dep. of Joe King at 14-15; Dep. of Earl Cram at 12, 18; Dep. of Jennifer McMenamin at 12, 13.)  We must now examine the terms of the unwritten policy to see if it "establishes a mandatory requirement so as to deprive government employees of discretion," which "depends on the terms of the particular policy at issue."  Autery, 992 F.2d at 1529.  The unwritten policy consists of park employees completing yearly or bi-yearly informal inspections of the trees, and additional inspections subsequent to storms.  (See Waterman Dep. at 22, King Dep. at 18; McMenamin Dep. at 13.)  In addition, Park Service employees are taught to look out for hazards and report them when found.  (See Waterman Dep. at 36.)  From these assertions, it is clear that the inspection plan in effect at the time of the accident did not compel Park Service employees to inspect certain trees on certain days or remove certain trees according to any timeline.  See Autery, 992 F.2d 1529.  Thus, we conclude that the informal plan "did not mandate any particular methods of hazardous tree management," and find that, to the contrary, the policy granted the employees discretion in dealing with the trees in VFNP.  See Merando, 517 F.3d at 172.  Accordingly, the first prong in Gaubert is satisfied.  See Id.; Autery, 992 F.2d 1529.

In light of our finding that no mandatory statute, regulation or policy controlled the Government's informal tree inspection policy, we now address whether the choices involved in creating and implementing this plan are grounded in social, economic and public policy.  See Gaubert, 499 U.S. at 324.  We conclude that they are so grounded.  "Generally, courts have held that decisions about what safety measure to employ in national parks and how to execute them involve balancing the same considerations that inform all policy decisions regarding the management of national parks: safety, aesthetics, environmental impact, and available financial

resources." Autery, 992 F.2d 1530; see also Kiehn v. United States, 984 F.2d 1100, 1105 (10th Cir. 1993); Bowman v. United States, 820 F.2d 1393, 1395 (4th Cir. 1987); 16 U.S.C. §§ 1, 3.

In this case, VFNP contains "thousands, if not millions" of trees amongst a plethora of other wildlife and miles of trails and roadways that must be maintained by the Park Service. (See Waterman Dep. at 8.) Just as in Merando, we find that maintenance of VFNP is a policy decision as the Government "had to consider how best to use its limited financial and human resources in a manner that balanced visitor safety with visitor enjoyment and conservation of the Park." Merando, 517 F.3d at 172; see also Kilby v. United States, 145 F. Supp. 2d 666, 673 (W.D. Pa. 2001) (citing Layton v. United States, 984 F.2d 1496, 1504 (8th Cir. 1993), cert. denied, 510 U.S. 877 (1993)). Thus, the Government's decision as to the maintenance of trees in VFNP is not subject to "judicial second guessing." Gaubert, 499 U.S. at 324. Accordingly, the second prong of the Gaubert test is satisfied.

Finally, Plaintiffs argue that the DFE is not applicable because "the evidence shows (or at least, creates a genuine issue of material fact) that the Defendants did not have a written policy for dealing with hazardous trees, nor is there any objective proof that they had an informal policy." (Pls.' Reply at 9.) In addition, Plaintiffs' contend that "even if there was an informal policy in place, there is more than sufficient evidence to create a genuine issue of material fact as to whether the Park employees ignored this policy or carried it out in a negligent manner." (Id.)

We find Plaintiffs' arguments unpersuasive. The district court operates as the ultimate finder of fact in jurisdictional questions, and "is thus entitled to draw inferences in favor of the defendant if it determines that the evidence warrants such inferences." S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 343 (3d Cir. 2012). Here, the record clearly shows that, although

no formal policy existed at the time of the incident, there was an unwritten policy in place to inspect and maintain the trees in VFNP.  There is no evidence suggesting that the Park Service failed to follow this informal policy.

## IV.    CONCLUSION

For the aforementioned reasons, we find that the Government's conduct was discretionary and "of the kind that the DFE was designed to shield."  Gaubert, 499 U.S. at 322-23.  Though we express sorrow at the serious injuries suffered by Plaintiffs, it is clear that Plaintiffs' claims are jurisdictionally barred by the DFE.  Consequently, the Government's Motion to Dismiss is granted.

An appropriate Order follows.